UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF ILLINOIS
URBANA DIVISION

| | |
|---|---|
| **MARGA BAKER,** ) | |
| ) | |
| **Plaintiff,** ) | |
| v. ) | **Case No. 12-CV-2156** |
| ) | |
| **MACON RESOURCES, INC.,** ) | |
| ) | |
| **Defendants.** ) | |

# OPINION

Plaintiff, Marga Baker, filed her Complaint (#1) on June 13, 2012, alleging that Defendant, Macon Resources, Inc., violated her rights under the Age Discrimination in Employment Act (ADEA), 29 U.S.C. § 623, when it terminated her employment. Defendant filed this Motion for Summary Judgment (#15) on June 21, 2013. Plaintiff's Response (#17) was filed July 22, 2013. Defendant filed its Reply (#18) August 5, 2013. This court has carefully reviewed the arguments of the parties and the documents filed by the parties. Following this careful and thorough review, Defendant's Motion for Summary Judgment (#15) is GRANTED.

## BACKGROUND[1]

Plaintiff was born October 30, 1954, and was employed by Defendant from October 28,

---

[1] The facts are taken from the parties' statements of undisputed facts and the documents submitted by the parties, including the transcripts of deposition testimony. This court notes that Plaintiff did not dispute many of the facts listed by Defendants. This court therefore accepts those facts as material and undisputed pursuant to Rule 7.1(D)(2) of the Local Rules of the Central District of Illinois. As far as the additional undisputed facts listed by Plaintiff, this court has only included facts which are material to the issues in this case and supported by the record.

1991, until March 11, 2011, when Defendant discharged her from employment. Defendant, which employs approximately 200 individuals, is a social service agency doing business in Macon County, Illinois, and provides services to individuals with developmental disabilities and mental illness. One of those services provided by Defendant to individuals with developmental disabilities is the community integrated living arrangement, or "CILA" housing. A CILA home is one in which a smaller number of unrelated adults with developmental disabilities reside on a full-time basis with 24-hour assistance by trained support personnel to help the residents with their daily living skills. Defendant owns and operates several CILA homes in Macon County. Each CILA home houses anywhere from four to eight people. Defendant had CILA homes at North Port, Main Street, and Timari Court in Decatur, Macon County, Illinois.

Immediately prior to Plaintiff's discharge, Defendant employed Plaintiff as a "Direct Support Person" (DSP), a position Plaintiff held for 19 years. At various times during her employment with Defendant, Plaintiff was assigned to work as a DSP at CILA homes in Decatur, Illinois. In the months before her discharge, Plaintiff worked at a CILA on Timari Court in Decatur. The Timari Court CILA home was staffed by seven to eight DSPs who either worked alone or with a partner during one of three daily work shifts, so that each CILA home had a DSP on site at all times. The Timari Court home also had a Defendant-employed "manager" who maintained an office within the CILA home and supervised the work of the DSPs. The individuals in the CILA homes had various levels of mental disabilities. Some had verbal skills while others did not. Plaintiff's job required her to assist all these individuals with such basic life functions as going to the restroom, feeding, dressing, and movement. Her job also required her to do all essential CILA housework during her work shifts, including cooking and cleaning.

2

One of plaintiff's most important job duties was to keep the individuals she served safe and free from physical abuse. Plaintiff received annual training concerning the recognition of physical abuse of individuals served. During the time she worked at CILA houses in Decatur Plaintiff had a co-worker named Dave Carter. Plaintiff alleges that on two occasions, once in 1996 and once in 1997, she observed Carter approach a North Port CILA house resident in the dining room of the North Port CILA house and "flick" with his fingers the neck of that individual. Plaintiff reported that Carter laughed as he did this and that on each occasion the individual's head jerked forward following the flicking. On the second occasion, Plaintiff overheard the individual verbalize a sound Plaintiff interpreted as equivalent to the word "no." Plaintiff alleges that after each incident she orally reported Carter's conduct to the North Port CILA house manager. She alleges that, in 1996, that Dave Wasserkrug was the house manager. In 1997 the house manager was Erin Dews. Plaintiff reports that on each occasion the respective managers told Plaintiff that the allegations concerning Carter's conduct would be "looked into." Plaintiff, however, was never told to what extent any supervisory action took place concerning the subject of her reports.

Several years after the incidents witnessed by Plaintiff, the Illinois Office of the Inspector General (OIG) opened an investigation concerning allegations that Carter had abused an individual residing the Timari Court CILA house in November 2010. The OIG has the authority to investigate allegations of abuse of adults with mental disabilities who receive services from Defendant and other service providers. Between the dates of November 18, 2010, and February 17, 2011 OIG Investigator Robin Warren interviewed Plaintiff in connection with the Carter investigation. During the course of the interview, Warren asked Plaintiff to describe any physical contact she had observed between Carter and individuals in the Timari Court house. Plaintiff told Warren that she had

observed Carter use his fingers to flick the back of the neck of a resident at the North Port house.

On February 17, 2011, Defendant's Executive Director, Dreux Lewandowski, received an investigative report issued by the OIG setting forth the findings of its investigation into Carter. Lewandowski was born in 1950 and became Defendant's Executive Director in April 2004. He had not been employed by Defendant prior to 2004. The investigative report, in the portion relevant to the proceedings before this court, concluded that Carter had in fact used his fingers to flick a resident on the back of the resident's neck. The OIG deemed this to be an act of physical abuse. The OIG also made a recommendation that Defendant address the failure of three employees to report Carter's conduct. The OIG identified these employees to be Plaintiff, Angela Cross, and Mary Davis. The report did not identify that the flicking observed by Plaintiff occurred in 1996 or 1997, nor did the report identify that the location of the flicking was at the North Port CILA house, and not the Timari Court CILA house. Defendant had, on December 1, 2010, discharged Carter from employment by Defendant, for reasons unrelated to the incidents described in the investigative report. Because of that Lewandowski had no decision to make concerning Carter's employment in February 2011, following the arrival of the investigative report. Prior to receiving the report, Lewandowski was unaware of any allegation that Plaintiff had witnessed physical abuse of any individual served by Defendant. Lewandowski accepted the findings of the OIG's investigative report at face value and conducted no additional investigation.

Lewandowski concluded that Plaintiff engaged in a significant violation of Defendant's abuse and neglect reporting policy and that as a result would be discharged from Defendant's employment. Lewandowski stated that Plaintiff witnessed the abuse of an individual served by Defendant and did not report the same. Plaintiff, however, asserts that she did report the incidents

at the time they occurred to her supervisors Dave Wasserkrug and Erin Dews. All decisions made by Lewandowski concerning the resulting consequences to Plaintiff were made solely based upon the information contained in the investigative report. Defendant's policies and procedures mandate that any employee of Defendant's who witnesses any suspected abuse, neglect, or infringement of the rights of an individual served by Defendant immediately report such an incident to appropriate Defendant officials so that an appropriate follow up investigation can occur.

Davis' date of birth is August 23, 1949. Davis' employment with Defendant was terminated on March 11, 2011. Defendant's disciplinary rules call for discharge from Defendant's employment when "significant" inappropriate behavior or unacceptable job performance occurs. The investigative report stated that Davis admitted to observing Carter flick the neck of an individual served by Defendant. Defendant has always maintained that Davis' employment was terminated due to Davis' failure to report Carter's conduct.

Cross' date of birth is April 10, 1971. Cross was also disciplined by Defendant following the receipt of the investigative report. The investigative report states that Cross recalled an encounter with a resident following Carter's shift where the resident was agitated and said he was mad. When Cross asked the resident what was wrong, the resident shook his hand toward the door, yelled, and then flipped his genitals with his hand. Cross asked the resident who did that to him, but Cross could not understand the response. About one week after this incident, Cross overheard Carter tell another staff member "yes, I pulled it," which led Cross to believe Carter was referring to something he (Carter) had done to the agitated resident she had spoken with the previous week. Cross suspected that the resident was trying to tell her something that Carter had done to him. Lewandowski concluded that Cross was in violation of Defendant's abuse and neglect reporting

policy because Cross suspected Carter had abused a resident, but did not report the same. Defendant's disciplinary rules allow for the suspension of an employee as a disciplinary measure to correct serious misconduct or unacceptable job performance. Lewandowski decided to suspend Cross' employment for three work days and required her to be re-trained on Defendant's abuse and neglect reporting expectations. He elected not to discharge Cross due to the fact that she did not directly observe any actual physical abuse.

Jacqueline White-Walls, a fourth employee of Defendant, was also mentioned in the OIG report, but the OIG did not recommend Defendant discipline her because she neither observed Carter abuse a resident or formed any suspicion in her mind about Carter's conduct. Lewandowski did not impose any discipline on White-Walls.

On or about March 11, 2011, Defendant provided a disciplinary action notice to Plaintiff within which Defendant advised Plaintiff that her employment was terminated due to the findings of the investigative report that provided that she had witnessed Carter flick an individual served on the back of the individuals neck and had failed to report the same. She was advised of her discharge from employment by Janet Shelton and Patricia Jablonsky. Shelton served as Defendant's Director of Community Living Services. Shelton was born in 1954 and had been employed by Defendant since January 2005. Jablonsky served as Defendant's Director of Human Resources. Jablonsky was born in 1951 and had been employed by Defendant since November 2002. Shelton orally advised Plaintiff that her discharge was due to Plaintiff's failure to report an observed incident of physical abuse suffered by a resident, as described in the disciplinary action notice. At that time Plaintiff informed Jablonsky and Shelton that when the incidents with Carter occurred she informed her supervisors Wasserkrug and Dews about Carter's actions. Dews, who was in her twenties at the

time, had an obligation under Illinois law to forward that information to the proper authorities. By failing to forward that information, Dews violated both Defendant's policies and Illinois law. Defendant's reporting policies are satisfied if an employee reports an incident to his or her supervisor.

On April 15, 2011, Plaintiff filed a charge of discrimination against Defendant before the Illinois Department of Human Rights (IDHR) and the federal Equal Employment Opportunity Commission (EEOC). She received her right to sue letter from the EEOC on April 18, 2012. She initiated this lawsuit on June 13, 2012. When asked via interrogatory to identify any younger employee of Defendant similarly situated to herself who she contends was not terminated from Defendant's employment, Plaintiff stated "Jackie Wells-White and Angela Cross." Plaintiff, however, conceded during her deposition that she did not know if either Cross or Wells-White ever observed Carter physically abuse an individual served by Defendant. Lewandowski had no knowledge at the time he made the decision to terminate Plaintiff's employment that Plaintiff had claimed that she in fact had reported to her supervisors that she observed Carter abuse a resident.

## THE INSTANT LITIGATION

Plaintiff's Complaint (#1) alleged that Defendant violated her rights under the ADEA, in that Defendant terminated her employment because it was holding "her to different standards than similarly situated younger employees" that were not terminated. As a direct result of the termination, Plaintiff alleges she has suffered "mental anguish, inconvenience, embarrassment, the loss of the enjoyment of life and lost wages." Defendant filed its Motion for Summary Judgment (#15) on June 21, 2013, and Plaintiff filed her Response (#17) on July 22, 2013. Defendant's Reply (#18) was filed August 5, 2013. The motion is fully briefed and ready to be ruled upon.

ANALYSIS

In its motion for summary judgment, Defendant argues that Plaintiff cannot produce evidence that her age was a "but-for" cause of her discharge from Defendant's employment. Further, Plaintiff could provide no evidence that the person responsible for her discharge, Lewandowski, had any knowledge that she actually reported Carter's abuse of a resident when the incident occurred. Defendant also argues that the younger employees who were not terminated were not similarly situated to Plaintiff. Plaintiff contends that she has satisfied her obligations to state a prima facie case for age discrimination under the ADEA. Plaintiff argues that, contrary to Defendant's assertions, Cross was similarly situated to Plaintiff in that she failed to report abuse, but unlike Plaintiff was not terminated. Plaintiff argues that Cross had more than "mere suspicion" that Carter was abusing CILA home residents and was not fired because she was younger than Plaintiff. Plaintiff also argues that, at the time of her termination, she advised that she had spoken to her supervisors in the 1990s when Carter's abuse occurred, thus satisfying Defendant's reporting policies.

SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); see also *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). In ruling on a motion for summary judgment, a district court "has one task and one task only: to decide, based on the evidence of record, whether there is any material dispute of fact that requires a trial." *Waldridge v. Am. Hoechst Corp.*, 24 F.3d 918, 920 (7th Cir. 1994). In making this determination, the court must construe the evidence in the light most favorable to the nonmoving party and draw all reasonable inferences in

favor of that party. See *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986); *Singer v. Raemisch*, 593 F.3d 529, 533 (7th Cir. 2010). However, a court's favor toward the nonmoving party does not extend to drawing inferences which are only supported by speculation or conjecture. See *Singer*, 593 F.3d at 533. In addition, this court "need not accept as true a plaintiff's *characterization* of the facts or a plaintiff's legal conclusion." *Nuzzi v. St. George Cmty. Consol. Sch. Dist. No. 258*, 688 F. Supp. 2d 815, 835 (C.D. 2010) (emphasis in original).

The party opposing summary judgment may not rely on the allegations contained in the pleadings. *Waldridge*, 24 F.3d at 920. "[I]nstead, the nonmovant must present definite, competent evidence in rebuttal." *Butts v. Aurora Health Care, Inc.*, 387 F.3d 921, 924 (7th Cir. 2004). Summary judgment "is the 'put up or shut up' moment in a lawsuit, when a party must show what evidence it has that would convince a trier of fact to accept its version of events." *Koszola v. Bd. of Educ. of City of Chicago*, 385 F.3d 1104, 1111 (7th Cir. 2004), quoting *Johnson v. Cambridge Indus., Inc.*, 325 F.3d 892, 901 (7th Cir. 2003). Specifically, to survive summary judgment, the nonmoving party "must make a sufficient showing of evidence for each essential element of its case on which it bears the burden at trial." *Kampmier v. Emeritus Corp.*, 472 F.3d 930, 936 (7th Cir. 2007), citing *Celotex Corp.*, 477 U.S. at 322-23.

## CLAIMS UNDER THE ADEA

"The ADEA makes it unlawful for an employer to 'discharge any individual ... because of such individual's age.'" *Fleishman v. Continental Casualty Company*, 698 F.3d 598, 603 (7th Cir. 2012), quoting 29 U.S.C. § 631(a) (limiting the ADEA's protections to those over forty years of age). To prevail under the ADEA, Plaintiff must show by a preponderance of the evidence that her age was the but-for cause of Defendant's decision to fire her. *Senske v. Sybase, Inc.*, 588 F.3d 501,

506 (7th Cir. 2009), citing *Gross v. FBL Financial Services, Inc.*, 557 U.S. 167, 177 (2009). A party alleging discrimination under the ADEA may proceed under the direct or indirect method of proof and may rely on circumstantial evidence to meet her burden. *Teruggi v. CIT Group/Capital Finance, Inc.,* 709 F.3d 654, 659 (7th Cir. 2013). Plaintiff concedes that she cannot proceed under the direct method of proof, and is instead relying on the indirect, or "burden shifting method," of proof.[2]

The indirect method relies on the burden-shifting approach established in *McDonnell-Douglas Corp. v. Green*, 411 U.S. 792 (1973). *Martino v. MCI Communications, Inc.*, 574 F.3d 447, 452 (7th Cir. 2009). To establish a prima facie case of age discrimination under the indirect method, Plaintiff must prove that: (1) she is a member of a protected class (which she is, being 40 or older); (2) her performance met the company's legitimate expectations; (3) despite her performance she was subjected to an adverse employment action; and (4) the company treated similarly situated employees under 40 more favorably. *Martino*, 574 F.3d at 453. If Plaintiff satisfies these criteria, Defendant may provide a legitimate, nondiscriminatory reason for the termination. *Martino*, 574 F.3d at 453. Assuming Defendant offers as much, Plaintiff may challenge the stated reason as a pretext for discrimination. *Martino*, 574 F.3d at 453. However, the ultimate burden to prove intentional discrimination remains with Plaintiff. *Martino*, 574 F.3d at 453.

Plaintiff argues she has satisfied her obligations to state a prima facie case. It is clear that Plaintiff, who was 56 at the time of her termination, was in the protected class. Further, Plaintiff

---

[2] "Acknowledging that she cannot proceed under the direct method of proof, Baker is relying upon the burden shifting method first articulated for discrimination claims in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L. Ed. 2d 668 (1973)." Plaintiff's Memorandum of Law In Opposition to Defendant's Motion for Summary Judgment (#17), page 17.

suffered an adverse employment action when Defendant terminated her employment. Defendant disagrees, however, that Plaintiff has satisfied the second (she was performing according to Defendant's expectations) and fourth (similarly situated substantially younger employees were treated more favorably) elements of the indirect test. Defendant argues that Plaintiff cannot point to a similarly situated employee under 40 who was treated more favorably. Plaintiff argues that Angela Cross, who was 39 at the time of Plaintiff's termination, was similarly situated and treated more favorably than Plaintiff.

The court will first address whether Plaintiff has satisfied the fourth element of the prima facie case under the indirect method. "Whether two employees are 'similarly situated' is a common sense inquiry that depends on the employment context." *Filar v. Board of Education of City of Chicago*, 526 F.3d 1054, 1061 (7th Cir. 2008). The Seventh Circuit has gone on to describe this prong thusly:

> "The purpose of the prima facie case is to ensure that there is enough evidence to raise the specter of discrimination, justifying judgment for the plaintiff if the employer does not provide a legitimate business reason for its action. [citation omitted] All things being equal, if an employer takes an action against one employee in a protected class but not another outside that protected class, one can infer discrimination. [citation omitted] The 'similarly situated' prong establishes whether all things are in fact equal. [citation omitted] To make this showing, a plaintiff need not present a doppleganger who differs only by having remained in the employer's good graces. But the comparator must still be similar enough 'to eliminate confounding variables, such as differing roles, performance histories, or decision-

making personnel, [so as to] isolate the critical independent variable: complaints about discrimination." *Filar*, 526 F.3d at 1061.

The similarly situated requirement is not meant to be applied mechanically or inflexibly, but rather it "*'normally'* entails a showing that the two employees dealt with the same supervisor, were subject to the same standards, and had engaged in similar conduct without such differentiating or mitigating circumstances as would distinguish their conduct or the employer's treatment of them.'" *Humphries v. CBOCS West, Inc.*, 474 F.3d 387, 404-05 (7th Cir. 2007), quoting *Radue v. Kimberly-Clark Corp.*, 219 F.3d 612, 617-18 (7th Cir. 2000) (emphasis in original (*Humphries* case, not *Radue*)). The inquiry is flexible and considers all relevant factors, the number of which depends on the context of the case. *Humphries*, 474 F.3d at 405. While complete identity is not required, there must at least be substantial similarity. *Humphries*, 474 F.3d at 405.

Plaintiff and Cross had similar duties and supervisors.[3] They both worked as DSPs in Defendant's CILA homes in Decatur in the 1990s during the time Carter was employed by Defendant. For those purposes, they are similarly situated. However, the most relevant and important factor in this case, the factor that Defendant claims was the key reason for the adverse employment action taken, is the wrongful conduct at issue: failure to report abuse by Carter of individuals served by Defendant. See *Humphries*, 474 F.3d at 405, quoting *Radue*, 219 F.3d at 617 ("***the similarly situated inquiry is a flexible one that considers 'all relevant factors, the number of which *depends on the context of the case*.'") (emphasis added). Plaintiff, Davis, and Cross

---

[3]The court is not considering Jacqueline White-Walls as a similarly situated employee, since both parties admit she neither observed Carter abuse an individual nor did she form any suspicion in her mind about Carter's conduct. The investigative report recommended no disciplinary action against White-Walls and Lewandowski imposed no discipline upon White-Walls.

violated Defendant's regulations and were disciplined for failure to report abuse. However, while Plaintiff was fired (along with Davis) and Cross only suspended, the evidence of record reveals that the difference in their punishment was not due to age discrimination, but rather to *conduct*. True, complete identity is not required, but there must still be *substantial similarities*. *Humphries*, 474 F.3d at 405. Both Plaintiff and Cross, in a general sense, failed to report abuse. However, failing to report mere suspicion of abuse is not similar to failing to report actual abuse.[4]

The court disagrees with Plaintiff's assertion that the distinctions between Plaintiff and Cross "are not terribly significant." Cross only had suspicions, based on non-verbal and unintelligible communications from a CILA resident and her own overhear of a fragment of conversation Carter had with another employee, that Carter *might* have abused a resident. While certainly wrongful conduct, Cross' failure to report her *suspicions* is not the same as Plaintiff's failure to report actual, witnessed physical abuse by Carter of a resident. It is reasonable that Defendant may decide to discipline more harshly a failure to report witnessed abuse versus a failure to report suspected abuse. If the situation were reversed, and Cross was terminated along with Plaintiff and Davis, she would have a strong argument for wrongful termination when she never actually personally witnessed physical abuse, but only had suspicions that she could not confirm. Plaintiff's conduct, as known to Lewandowski at the time of her termination, was substantially more wrongful than Cross'. When one employee's conduct is more egregious than a comparator in a similarly situated analysis, those

---

[4] It is not disputed by the parties that the investigative report contained no mention of Plaintiff's allegation that she reported Carter's abuse to her supervisors. It is also not disputed that Lewandowski based his disciplinary decisions on the investigative report, and had no knowledge, at the time he terminated Plaintiff, that Plaintiff had reported Carter's abuse to her supervisors in the 1990s. The court is basing its ruling on what Lewandowski knew at the time he terminated Plaintiff's employment.

employees cannot be said to be similarly situated. See *Henry v. Jones*, 507 F.3d 558, 566 (7th Cir. 2007) (Where conduct of white officer was more egregious than that of the non-white officers he highlights, he could not demonstrate a prima facie case of discrimination on the basis of race under the indirect method, and therefore could not avoid summary judgment on that basis). Thus, Cross is not a similarly situated employee who received more favorable treatment. Because Plaintiff cannot satisfy this element, Plaintiff has not made a prima facie case for age discrimination under the indirect method. Defendant's Motion for Summary Judgment (#15) is GRANTED.

IT IS THEREFORE ORDERED:

(1) Defendant's Motion for Summary Judgment (#15) is GRANTED. Judgment is entered in favor of Defendant and against Plaintiff on Plaintiff's Complaint (#1).

(2) This case is terminated.

ENTERED this 4th day of October, 2013

/s Michael P. McCuskey
MICHAEL P. McCUSKEY
U.S. DISTRICT JUDGE